**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
ROSS MARRAZZO,

        Plaintiff,

   -against-

FLAGSTAR FINANCIAL, INC., and
ALESSANDRO DINELLO,

        Defendants.
-----------------------------------------------------------------X

**COMPLAINT**

Ross Marrazzo ("Marrazzo" or "Plaintiff"), by and through his attorneys, Wigdor LLP, as and for his Complaint against Defendant Flagstar Financial, Inc.[1] ("Flagstar" or the "Bank") and Alessandro DiNello ("DiNello") (collectively "Defendants"), hereby alleges as follows:

**PRELIMINARY STATEMENT**

1. Marrazzo was a standout employee at New York Community Bancorp, Inc. ("NYCB"), who received positive reviews and bonuses in recognition of his wide-ranging efforts to keep the troubled bank in compliance with regulations. In early 2024, Marrazzo began reporting directly to DiNello, then the Executive Chair, President and Chief Executive Officer ("CEO") of the Bank.

2. In his new role, Marrazzo almost immediately found that DiNello had direct knowledge of a client's money laundering activities. DiNello moved to interfere with Marrazzo's investigation and baldly threatened to fire him.

---

[1] Marrazzo was employed by an entity that was called New York Community Bancorp, Inc. ("NYCB"). Through acquisitions and rebranding, that bank is now Flagstar Financial, Inc. The predecessor entities NYCB and Flagstar Bank are therefore referenced using their contemporaneous names throughout this Complaint.

3. Unbelievably, DiNello also violated regulations protecting material, non-public information by discussing a sensitive company transaction on a Zoom conference while a junior employee sat on his lap. The Bank hired an outside firm to investigate the incident, and DiNello got away with this violation as well.

4. Finally, Marrazzo (and his direct report, the Financial Crimes Compliance Officer for the Bank) opened an investigation into DiNello himself in the summer of 2024 and interviewed him about possible violations of New York Stock Exchange ("NYSE") and Securities and Exchange Commission ("SEC") rules regarding money laundering and insider trading. Marrazzo was terminated in the midst of his investigation, just before he had the opportunity to conclude the investigation and potentially notify the appropriate government authorities, and DiNello made good on his promise to fire Marrazzo for interfering with his illegal activities.

5. Furthermore, and separately, Marrazzo had an employment agreement with NYCB that entitled him to a severance payment should he be terminated prior to June 14, 2025. The Bank therefore owes him his unpaid severance agreement as well, along with liquidated damages.

6. Plaintiff brings this action to recover damages arising from Defendants' unlawful retaliation against him for protected whistleblower activities in violation of Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A (the "Sarbanes-Oxley Act"); New York Labor Law ("N.Y.L.L.") § 193; and New York common law.

## PARTIES

7. Plaintiff Ross Marrazzo was the Enterprise Chief Compliance Officer at the Bank. At all relevant times, Marrazzo was an "employee" of Flagstar (which, at the time, was called NYCB) under the Sarbanes-Oxley Act.

8. Defendant Flagstar Financial, Inc. is a New York corporation, headquartered in Hicksville, New York with its principal place of business located at 102 Duffy Avenue, Hicksville, NY 11801. At all relevant times, Flagstar was an "employer" under the Sarbanes-Oxley Act.

9. Defendant Alessandro DiNello is the Director of Flagstar Financial, Inc. and the former Executive Chair, President and CEO of Flagstar. At all relevant times, DiNello was an officer, employee or agent of Flagstar.

## ADMINISTRATIVE PROCEDURES

10. Marrazzo filed a Complaint with the U.S. Department of Labor's Occupational Safety & Health Administration ("OSHA") on January 16, 2025.

11. More than 180 days have passed since Marrazzo filed his Complaint with OSHA and no final decision has been issued with respect to the allegations in his Complaint.

12. Accordingly, Marrazzo is entitled to seek de novo review of his allegations in federal court. 18 U.S.C. § 1514A(b)(1)(B).

13. Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

**I.     Marrazzo's Background**

14.     For over 40 years, Marrazzo has worked in the regulatory compliance field, leading and addressing the efficacy of risk management, regulatory compliance, and auditing programs at multinational corporations.

15.     Marrazzo also worked closely with government agencies, leading efficiency assessments of compliance programs as an independent consultant and monitor.

16.     His exemplary record led him to NYCB in 2022, where he took the role of Enterprise Chief Compliance Officer.  He reported directly to the Bank's President and CEO.

17.     His wide-ranging responsibilities included overseeing the consolidation of several NYCB compliance programs with those of acquisitions Flagstar and Signature Bank ("Signature") and managing the complex designs of those programs.

18.     By all accounts, Marrazzo excelled in his role with NYCB.  He met regularly with the CEO and the board, received a positive 2023 employee review, and was one of just a few executives to receive a bonus for that year.  Marrazzo was even asked to take on the responsibilities of Interim Chief Risk Officer in early 2024, in addition to the rest of his already numerous responsibilities.

19.     In these roles, Marrazzo oversaw NYCB's ethics program and was intimately involved in investigating ethical violations and breaches of federal laws and regulations.

20.     His diligent attempts to expose wrongdoing at NYCB, perform his job, and protect the Bank from exposure to regulatory and legal jeopardy ultimately led him to run afoul of DiNello.

## II. Flagstar's Background

21. Flagstar has faced major regulatory challenges in the past few years.

22. Between December 2022 and March 2023, NYCB acquired both Flagstar Bank and certain assets and liabilities of Signature.

23. Signature was a failed bank which was taken over by the Federal Deposit Insurance Corporation ("FDIC"). It had significant regulatory issues and struggled with criminal activity in its portfolio. In his role, Marrazzo took the lead in remediating these issues with the support of the former CEO.

24. Flagstar Bank also had regulatory challenges.

25. In early 2024, in the wake of financial problems at NYCB, DiNello, who had previously been President, CEO, and Chairman at Flagstar Bank before it was acquired by NYCB, became Executive Chair, President and CEO of NYCB.

26. At around the same time, a group of hedge funds headed by Liberty Capital acquired a controlling interest in the Bank.

27. Shortly thereafter, Marrazzo headed or supported multiple investigations into or involving DiNello.

## III. DiNello's Tipping

28. The first incident involving DiNello and Marrazzo occurred in February 2024.

29. The Bank's anti-money laundering ("AML") monitoring program flagged a suspicious client transaction.

30. Marrazzo and his team conducted a proper investigation and found that the client was structuring deposits, which is illegal.[2]

31. Marrazzo's investigation found that there were at least three instances of structuring on the client's account, confirming the irregularity.

32. The proper way to remediate a structuring problem is to close the account and file a SAR with FinCEN.

33. The client was a long-standing client of Flagstar Bank before it was acquired by NYCB. As a result, Marrazzo decided to reach out to DiNello about the problem, because DiNello had been with Flagstar.

34. Marrazzo therefore emailed DiNello with information regarding the illegal activity and informed him that the account was going to be closed.

35. DiNello responded, urging Marrazzo to keep the account open.

36. DiNello remained resistant even after Marrazzo provided him with clear information demonstrating that the account needed to be closed. In fact, DiNello urged Marrazzo to go to the client and let the client know that these transactions had been flagged for restructuring. Marrazzo informed DiNello, in no uncertain terms, that contacting the client was not permissible under federal regulations.

37. Despite DiNello's efforts to stymie his investigation, Marrazzo closed the account in accordance with 31 U.S.C. § 5324, other regulatory requirements, NYCB policy and industry practice.

---

[2] Structuring is a form of money laundering whereby an individual splits a large transaction into multiple smaller transactions in order to avoid being reported to the government.

38. Marrazzo quickly discovered why DiNello wanted to keep the account open illegally—DiNello had spoken to the client personally.

39. Further, DiNello initially lied to Marrazzo about having spoken to the client.

40. In a one-on-one meeting with Marazzo, DiNello revealed that he had previously called the client.

41. DiNello explained that the client in question had a "gambling problem" and the client "wouldn't have done it again," referring to the illegal activity, if Marrazzo hadn't closed the account.

42. It is likely DiNello informed the client of the Bank's investigation, which could be considered a form of "tipping," and also certainly violated the Bank Secrecy Act, 31 U.S.C. 5311, *et seq.*, and FinCEN guidance.

43. In that meeting, Marrazzo told DiNello, "I would do it again," meaning that he had no qualms about complying with the law and closing the account. DiNello responded, "I would fire you if you did."

44. DiNello therefore explicitly threatened to fire Marrazzo should he take an action against his wishes again and encouraged Marrazzo to engage in illegal activity.

45. At the beginning of the year, then, DiNello and the Bank were prepared to get rid of Marrazzo to prevent him from blowing the whistle and to enable them to violate the law.

46. From that point forward, Marrazzo was also cut out of executive meetings, a further indication of Flagstar's and DiNello's retaliatory animus.

IV. **DiNello's Failure to Protect Sensitive Information**

47. The tipping violation was not the only incident that indicates DiNello has difficulty complying with the law.

48. At the beginning of 2024, DiNello took a video meeting with counsel from the law firm Skadden, Arps, Slate, Meagher & Flom LLP.

49. During that meeting, material non-public information was discussed. DiNello had a clearly-visible junior NYCB employee sitting on his lap and rubbing his head.

50. This incident was raised to Marrazzo by another executive who was on the video call, as a whistleblower complaint about a legal and ethical issue. That whistleblower also sent screenshots of the incident to Marrazzo.

51. This incident raised two concerns for Marrazzo, both a human resources concern about a potentially inappropriate workplace relationship and a regulatory concern about sensitive, non-public information being discussed in the presence of a junior employee.

52. Marrazzo reported the incident to the Chair of the Audit Committee.

53. The incident was subsequently investigated by outside counsel from Cravath, Swaine & Moore LLP.

54. DiNello was not disciplined as, upon information and belief, other members of the Bank's Board described the incident as a "misdemeanor."

55. Marrazzo inquired as to why DiNello was not disciplined and was told outside counsel advised management that there was not a "policy in the company that would prohibit this."

56. He was also told that outside counsel advised management that DiNello "would have sued" the Bank "and it would be a mess" if he was terminated.

57. This episode is indicative of the attitude of Flagstar's leadership. Those at the helm of the Bank openly flout the law and defend one another when they need to do so.

58. It is also yet another example of Marrazzo raising a complaint about Bank leadership, in general, and DiNello in particular.

### V. Marrazzo Investigates DiNello and is Terminated

59. While Marrazzo investigated and raised many clear ethics complaints as part of his role, his termination was a brazen attempt to block an investigation into DiNello.

60. DiNello has a substantial, multi-million-dollar account with NYCB.

61. Around the time that Liberty Capital acquired a controlling interest in NYCB, the Bank offered management and board members a reduced price for stock. The offer was subsequently rescinded.

62. Around this time, DiNello made a $5 million transfer to a millionaire. DiNello subsequently received a $1.7 million transfer back.

63. These transfers were flagged by the Bank's AML monitoring program, and Marrazzo opened an investigation into DiNello's potential violation of NYSE[3] rules including, but not limited to, Rule 303A.10.

64. Marrazzo, along with the Financial Crimes Compliance Officer for the Bank, interviewed DiNello on June 26, 2024.

65. DiNello told Marrazzo that he had simply "lent" the money to an "old friend." As such, for this multi-million-dollar transaction, there was no paper trail.

66. This set off several alarm bells. It was unclear why DiNello's wealthy friend would need a gift of cash. Giving such a gift without any record could also raise tax implications.

---

[3] The NYSE is regulated by the SEC.

67. More troublesomely, the $5 million actually went into an LLC's bank account. DiNello subsequently received $1.7 million back from his friend's *personal* account. This raised concerns that DiNello could be using the transfer to launder money or to conduct insider trading and obfuscate the origin of his investments.

68. In the wake of this interview, Marrazzo held a good-faith belief that the transaction was an attempt to circumvent NYSE rules and that NYSE rules and SEC regulations regarding money laundering and/or insider trading might be violated. See, e.g., NYSE Rule 303A.10 & Rule 3310.

69. As such, his team filed a USA PATRIOT Act § 314(B) ("§ 314(b)") with other banks to obtain more information on the bank transaction.

70. About six weeks later, with the investigation ongoing, Marrazzo was abruptly terminated effective September 13, 2024.

71. He was waiting for a § 314(b) response from another bank which would have likely provided important information on the money movement.

72. Even without the § 314(b) response and prior to his firing, Marrazzo and the Financial Crimes Compliance Officer for the Bank strongly suspected that DiNello would need to be reported to the appropriate government authorities.

**VI.   Marrazzo's Contract**

73. When Marrazzo was fired, he had an active employment agreement.

74. Marrazzo entered into that agreement on June 14, 2022, and it was active for 36 months.

75. The agreement sets forth that he was employed at will, but subject to certain exceptions. Specifically, Marrazzo was owed a severance package if the Bank terminated him.

76. Marrazzo was neither offered nor paid this severance amount upon his termination, and his termination was "without cause."

## FIRST CAUSE OF ACTION
### (Retaliation in Violation of the Sarbanes-Oxley Act)

77. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

78. By the acts and practices described above, Defendants retaliated against Marrazzo for engaging in protected activity in violation of the Sarbanes-Oxley Act.

79. As a direct and proximate result of Defendants' unlawful retaliatory conduct, Marrazzo has suffered, and continues to suffer, harm, including, but not limited to, lost wages, restricted future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic and compensatory damages.

## SECOND CAUSE OF ACTION
### (Breach of Contract in Violation of New York Common Law)

80. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

81. The parties entered into a valid and enforceable Agreement, which was signed by both parties and effective as of June 14, 2022. Plaintiff performed his obligations under the Agreement.

82. Defendants violated this Agreement by failing to offer or pay Plaintiff his 36-week severance. Pursuant to Section 6(b) of Plaintiff's Employment Agreement, Plaintiff was entitled to "a single lump sum payment equal to the [his] Weekly Pay multiplied by the number of full weeks remaining under the then current Term of the Agreement as of his Termination Date."

83. Marrazzo was terminated effective September 13, 2024. His contract entitled him to employment through June 14, 2025, which was 36 weeks later. At Marrazzo's base salary of $500,000, he is entitled to a $333,333 lump sum severance payout.

84. Plaintiff's damages from this breach of his contract are the contractual compensation that was not provided, plus interest from the date of the breach.

### THIRD CAUSE OF ACTION
### (Nonpayment of Wages in Violation of N.Y.L.L. § 193)

85. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

86. N.Y.L.L. § 193 prohibits covered employers, such as Defendants, from making unauthorized deductions from the wages of any employee.

87. Marrazzo's unpaid severance falls within the definition of wages set forth in New York Labor Law § 193 and is subject to the remedies set forth in N.Y.L.L. § 198.

88. By failing to pay the full amount of Plaintiff's severance, Defendants made unlawful deductions and withholdings from Plaintiff's wages.

89. As a result of Defendants' willful and unlawful conduct, Plaintiff is entitled to an award of damages in an amount to be determined at trial, plus liquidated damages, prejudgment interest and reasonable attorneys' fees and costs.

### PRAYER FOR RELIEF

Plaintiff is seeking the following relief:

A. Reinstatement with the same seniority status that Marrazzo would have had, but for the retaliation;

      B.      Back pay, including bonuses, non-cash compensation including but not limited to stock, various performance-based compensation, deferred compensation, benefits, and all other remedies necessary to make Marrazzo whole;

      C.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Marrazzo for all monetary and/or economic damages, including but not limited to lost earnings;

      D.      An order requiring Defendants to abate and refrain from any further violations of the whistleblower provisions of the Sarbanes Oxley-Act;

      E.      An order prohibiting Defendants from disclosing any disparaging information about Marrazzo to prospective employers, or otherwise interfering with any applications he might make in the future;

      F.      Compensatory monetary damages in an amount determined to be fair and equitable compensation for Marrazzo's physical and emotional distress and loss of reputation;

      G.      Reasonable attorneys' fees for Marrazzo's attorneys and the costs of this litigation, including but not limited to reimbursement of all costs, including but not limited to deposition fees, witness fees, travel expenses, and other expenses to present, collect and produce evidence in this matter; and

      H.      Any and all other appropriate relief.

Dated: July 29, 2025
      New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
    Michael J. Willemin
    William R. Baker

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mwillemin@wigdorlaw.com
wbaker@wigdorlaw.com

*Counsel for Plaintiff*